[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11191

_____

D.C. Docket No. 1:15-cr-20576-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ENRIQUE MARTINEZ MATHEWS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 30 , 2017)

Before HULL, JORDAN, and GILMAN,* Circuit Judges.

HULL, Circuit Judge:

_____

*Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Defendant Enrique Martinez Mathews ("Martinez") appeals his total 60-month sentence.  After careful review of the briefs and the record, and with the benefit of oral argument, we affirm the district court's increases to Martinez's offense level for (1) alteration and falsification of an "especially probative record" under U.S.S.G. § 2J1.2(b)(3)(B), and (2) knowing that the victim of the offense was vulnerable under § 3A1.1(b)(1).  However, the district court erroneously concluded that it lacked any legal authority to grant an acceptance-of-responsibility reduction under § 3E1.1.  We thus vacate Martinez's sentence and remand for the district court to decide only the acceptance of responsibility issue and resentence Martinez.

## I.  FACTUAL BACKGROUND

The following facts are not in dispute.[1]  Beginning in 2007, Martinez was employed by the Miami Veterans Affairs Hospital (the "Miami VA") as a nurse in the Surgical Intensive Care Unit (the "SICU").  In August 2014, a 76-year-old veteran who was recovering from heart surgery was in the SICU (the "Patient").

At approximately 7:30 a.m. on September 2, 2014, the attending physician reviewed the Patient's records and determined that he was stable enough to be transferred to a lower-level-care ward within the Miami VA.  At 8:00 a.m. that

---

[1]The facts are taken from the government's factual proffer and the presentence report ("PSR"), which are virtually identical.  At his plea colloquy, Martinez ratified the factual proffer's accuracy and did not dispute any of the PSR's facts, and they are thus deemed to be admitted.  See United States v. Bennett, 472 F.3d 825, 832 (11th Cir. 2006).

2

morning, Martinez was assigned to care for the Patient. Martinez had no other patients assigned to him that day.

In the SICU, all patients are connected to machines that automatically and continuously read and record vital signs, which allows nurses and other medical providers to constantly monitor the patients. Shortly after Martinez assumed responsibility for the Patient's care, the Patient's vital signs began to deteriorate—his blood oxygenation, blood pressure, respiratory rate, and heart rate were all fluctuating abnormally. There were also extended periods of time when no vital signs were entered in the computer system, meaning that either the system had been manually deactivated or the cables had been unplugged.

For the remainder of the day on September 2, the Patient's vital signs were either not recorded by the computer system or, if recorded, showed serious degradation. Defendant Martinez did not inform anyone of the Patient's deteriorating vital signs. Instead, at approximately 5:00 p.m., Martinez transferred the Patient to the lower-level-care ward in accordance with the physician's morning transfer instructions. Had the SICU attending physicians been aware of the Patient's degrading health, they would not have allowed this transfer. During the transfer, Martinez did not inform the receiving unit of the Patient's wildly fluctuating vital signs.

3

At approximately 7:25 p.m. that evening, after Martinez returned to the SICU from transferring the Patient, he logged into the computer system used by the SICU to monitor and record patients' vital signs.  Using an "edit" function, Martinez entered and altered data in the Patient's record to make it appear as though the Patient had been stable throughout the day.  It is Miami VA policy that any time a data point is entered or altered in the computer system, the person entering that data must include a note.  There were no such notes in the Patient's record.  According to the computer system, all of the points entered or altered on the Patient's record were done by Martinez.

Later that evening, after Martinez had left the Miami VA, the Patient's condition worsened.  Shortly before 3:00 a.m. on September 3, about 10 hours after he was transferred out of the SICU, the Patient died of heart failure.

Martinez returned to work on the morning of September 4.  One of his supervisors confronted him regarding the Patient's care.  Martinez knew that, per Miami VA regulations, there would be an investigation into the Patient's death and the quality of the Patient's care.  Martinez then went back into the Patient's record on September 4 and entered a number of notations and comments relating to activities that had taken place on September 2.

As a result of the Patient's death, the Miami VA opened a medical case review, and Martinez was interviewed by "criminal investigators."  Martinez

4

admitted to the investigators that he falsified data in the Patient's medical record both on September 2 and September 4 "in an attempt to avoid responsibility for his misconduct, and the poor quality of care he provided to the [P]atient."[2]

## II.  PROCEDURAL HISTORY

### A.    Indictment and Guilty Plea

An indictment charged Martinez with (1) intentionally causing damage to a protected computer (the computer system of the Department of Veterans' Affairs (the "Department")) that resulted in the modification and impairment of the medical care of an individual, in violation of 18 U.S.C. § 1030(a)(5)(A) and (c)(4)(B) (Count 1); and (2) knowingly altering, destroying, concealing, covering up, falsifying, and making a false entry in data stored within the Department's computer system with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the Department's jurisdiction, in violation of 18 U.S.C. § 1519 (Count 2).

In December 2015, Martinez pled guilty to both counts of the indictment.  At the change-of-plea hearing, Martinez stated that, on September 2, 2014, he was in charge of the entire SICU and "because of the many emergencies and situations and because I was working and I was very busy, I did not provide my patient with the direct care that he should have had."

---

[2]The file from the VA's investigation is not in the record.

5

## B.    Presentence Report

Martinez's presentence report ("PSR") assigned him a base offense level of 14 and added the following offense-level increases: (1) a two-level increase because the offense "involved the destruction, alteration, or fabrication of a substantial number of records," under U.S.S.G. § 2J1.2(b)(3)(A); (2) a two-level increase because Martinez knew or should have known that the victim was vulnerable, under § 3A1.1(b)(1); and (3) a two-level increase for abusing a position of public trust, under § 3B1.3.  The PSR also awarded a three-level reduction for acceptance of responsibility pursuant to § 3E1.1(a) and (b).

With a total offense level of 17 and a criminal history category of I, the PSR fixed Martinez's advisory guidelines range as 24 to 30 months' imprisonment.  In addition, Martinez's convictions carried statutory maximum terms of 10 and 20 years' imprisonment, respectively.

Martinez filed objections to the PSR contesting the alteration-of-records and the vulnerable-victim increases, arguing that: (1) he compromised only one record in this case, not a "substantial number of records"; (2) the United States, not the Patient, was the "victim" of his criminal conduct; and (3) he had not "targeted" the Patient as a victim.

The government responded that Martinez did alter or falsify a "substantial number of records" because he had entered or altered at least 43 data points and/or

6

written comments in the Patient's medical chart (29 data points on September 2 and an additional 14 written comments on September 4). Furthermore, the government argued that even if Martinez did not qualify for an offense-level increase under subsection (A) of § 2J1.2(b)(3) by altering a "substantial number" of records, he nonetheless qualified under subsection (B) by altering or fabricating "essential or especially probative" records because the records that Martinez had altered would reveal whether Martinez furnished an acceptable level of care to the Patient.

The government also argued that the vulnerable-victim increase was proper because Martinez harmed a real person—a 76-year-old critically ill veteran—by failing to provide adequate care and then attempting to avoid responsibility for that victim's death. Moreover, Martinez had necessarily "targeted" the Patient when he failed to monitor the Patient's condition during his shift.

## C.    Sentencing Hearing

At the sentencing hearing, the district court overruled Martinez's objection to the alteration-of-records increase, stating: "It would appear to me that he did alter a substantial number of records. But even if he didn't he altered essential and probative records." The district court also overruled Martinez's vulnerable-victim objection because Martinez was the nurse in charge of the Patient's care and "his actions definitely targeted that particular patient."

7

The district court then stated that it had received a report that Martinez recently tested positive for cocaine on a drug test. Martinez did not dispute that he had failed a drug test. The district court then asked the probation officer if the rule was that a positive urinalysis meant a defendant lost his acceptance of responsibility decrease. The probation officer responded: "That is correct, Your Honor. [Under U.S.S.G. § 3C1.1,] he would not receive acceptance of responsibility based upon his positive urinalysis."

In response, Martinez noted for the district court that he had had 18 prior clean drug tests, took full responsibility for his lapse, and requested that the district court not revoke his reduction for acceptance of responsibility.

Later on, the district court confirmed with the probation officer that Martinez's advisory guidelines range would be 33 to 41 months' imprisonment without the reduction for acceptance of responsibility. The district court never made any findings about whether Martinez had accepted responsibility or not, however, apparently because the district court understood that it lacked any authority to grant the acceptance-of-responsibility reduction because of Martinez's failed drug test.

After both parties made their arguments, the district court found the guidelines range insufficient and varied upward to a 60-month sentence. As a basis for this upward variance, the district court detailed the facts of Martinez's

8

crime—that on September 2, 2014, Martinez was "assigned to care for only one patient beginning at 8 a.m.  The [P]atient was a 76-year-old veteran recovering from heart surgery."  The district court noted that, although patients in the SICU are hooked up to machines that constantly monitor their vital signs, "shortly after [Martinez] assumed responsibility for this [P]atient's care, the [P]atient's vital signs began to deteriorate.  Also there were extended periods of time during the day when no vital signs were entered into the records in the computer; meaning either that the system had been deactivated manually by the provider or the cables had been unplugged."

The district court recounted that even though the Patient's vital signs that were recorded that day showed "serious degradation" of the Patient's condition, "[a]t approximately 5 p.m. on this day, Mr. Martinez transferred the patient from the [SICU] to the lower level care ward."  The district court pointed out how Martinez "not only did not inform any caregivers or physicians about the deteriorating state of his patient's vital signs, he logged into the computer system and using an edit function, edited and altered the patient's records."  The district court noted that these "altered and edited data points gave the appearance, should a medical provider have checked those records, that the [P]atient was stable throughout the day.  Had [Martinez] alerted doctors, it is unlikely the patient would have been transferred out of [the SICU].  That night, the [P]atient died."

Under these facts and circumstances, the district court found that "[g]iven the nature and circumstances of the offense, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to afford adequate deterrence to criminal conduct, not just of this Defendant, but others," a 60-month total sentence was "an appropriate sentence."

Martinez timely appealed.

### III.  DISCUSSION

In reviewing a sentence, we begin by ensuring that the district court committed no significant procedural error, such as improperly calculating the advisory guidelines range, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.  Gall v. United States, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).  If the sentence is procedurally sound, we may then consider the substantive reasonableness of the sentence under an abuse-of-discretion standard.  Id.

Here, Martinez argues that the district court committed procedural error by: (1) applying the § 2J1.2(b)(3) increase for altering a substantial number of records or, in the alternative, for altering essential or especially probative records; (2) applying the § 3A1.1(b)(1) vulnerable-victim increase; and (3) denying him the

10

§ 3E1.1 reduction for acceptance of responsibility.  He also argues that his sentence is substantively unreasonable.  We address each issue in turn.[3]

## A.    The Alteration-of-Records Increase

Section 2J1.2(b)(3) of the Sentencing Guidelines provides that:

> If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by 2 levels.

U.S.S.G. § 2J1.2(b)(3).

On appeal, Martinez argues that the district court erred in applying the increase because he did not alter a "substantial number of records," nor did his offense involve "essential or especially probative record[s]."  Because this Court has never addressed § 2J1.2(b)(3)(A) or (B), we have never had an occasion to interpret the meaning of those terms.

There is little law, even outside this Circuit, addressing § 2J1.2(b)(3)(A) or (B).  The Fifth Circuit has upheld, without discussion, a § 2J1.2(b)(3)(A) increase in a case involving a person who held himself out as an immigration attorney, when he had in fact not attended law school or college.  United States v. Richardson, 676 F.3d 491, 499, 511 (5th Cir. 2012).  In Richardson, the defendant

---

[3]We review a district court's interpretation and application of the Sentencing Guidelines de novo and its factual findings for clear error.  United States v. Smith, 480 F.3d 1277, 1278 (11th Cir. 2007).

had filled out multiple forms representing that he had gone to law school and was a licensed attorney, such as motions for pro hac vice admission and applications to receive a bar number from two different bar associations, and he had also signed contracts with multiple putative clients. Id. at 498–500, 509.

We need not decide today whether the alteration and/or addition of 43 data points within a single medical record qualifies as a "substantial number of records" under § 2J1.2(b)(3)(A) because we hold that the increase was proper under § 2J1.2(b)(3)(B). The evidence amply supports the district court's conclusion that Martinez "selected" an "essential or especially probative record, document, or tangible object, to destroy or alter." See U.S.S.G. § 2J1.2(b)(3)(B).

According to the undisputed facts, the Miami VA had a hospital regulation requiring that, when a patient died, there would be an investigation into the quality of that patient's care. It follows that the Patient's medical chart from the day of his death would have been a key piece of evidence in this investigation. Indeed, Martinez did not dispute the statement in the PSR that "[m]edical providers frequently rely on patient records when analyzing treatment options. Had anyone viewed the patient's records, they would have seen an inaccurate patient history which may have resulted in a negative impact to the patient's care."

Under the plain and ordinary meaning of § 2J1.2(b)(3)(A), the Patient's medical records from September 2, 2014 were "absolutely necessary" (i.e.,

essential) to the VA's investigation into the Patient's quality of care and would "furnish[], establish[], or contribute[] toward proof" (i.e., be especially probative) on that point.  Thus, the Patient's medical chart from September 2, 2014—the day before his death—was an "essential or especially probative record" for purposes of both the VA's investigation of the Patient's death and the obstruction charge in Count 2, which was based on Martinez's interference with that investigation.  It is also clear that Martinez "selected" the Patient's medical record as the target of his alterations in order to derail and deceive that investigation.

Martinez attempts to argue that the Patient's medical record was not "essential or especially probative" because his "selection of the data to be changed related to [his] personal interest in job protection" and his goal in altering the document was to "shield his nursing errors from review."  But the plain language of § 2J1.2(b)(3)(B) says nothing about the defendant's subjective intent as to why he altered the records, only that the defendant "select[ed]" those records "to destroy or alter."  See U.S.S.G. § 2J1.2(b)(3)(B).  Martinez clearly did choose, and therefore select, the document.

Likewise, Martinez's emphasis of the fact that the government presented no evidence regarding the cause of the Patient's death or Martinez's own role in that death is a red herring.  Regardless of the ultimate cause of the Patient's death, that

13

does not change the fact that Martinez falsified what was going to be an "essential and especially probative" document in the investigation of that death.

For these reasons, the district court did not err in applying the two-level increase under § 2J1.2(b)(3)(B).

## B.    The Vulnerable-Victim Increase

A two-level increase applies where a defendant knew, or should have known, that a victim of the offense was vulnerable.[4]  U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is a person "who is a victim of the offense of conviction" or any relevant conduct for which the defendant is accountable, and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."  Id. § 3A1.1 cmt. n.2; see also United States v. Zats, 298 F.3d 182, 187 (3d Cir. 2002) ("[V]ictim status is not limited to those hurt by the offense of conviction, but also includes those hurt by relevant conduct outside that offense.").

Here, the district court did not clearly err in determining that the Patient was vulnerable—he was 76 years old and recovering from heart surgery in an intensive care unit.  See id.  Although Martinez argues that he did not "target" the Patient based on his infirmities, § 3A1.1(b) does not require that the defendant "target" the

---

[4]The application of the vulnerable-victim increase is a mixed question of law and fact that this Court reviews de novo.  United States v. Moran, 778 F.3d 942, 959 (11th Cir. 2015). However, a district court's factual finding that the victim is vulnerable may be reversed only if it is clearly erroneous.  United States v. Frank, 247 F.3d 1257, 1259 (11th Cir. 2001).

14

vulnerable victim.  See United States v. Birge, 830 F.3d 1229, 1231-33 (11th Cir. 2016).[5]  Instead, "the vulnerable victim enhancement applies so long as the defendant 'knew or should have known that a victim of the offense was a vulnerable victim.'"  Id. at 1233 (quoting U.S.S.G. § 3A1.1(b)(1)).

We likewise reject Martinez's argument that the United States was the real and only "victim" of his computer- and records-based crimes.  Martinez argues that the Patient is not a "victim" because the government cannot show the Patient suffered any actual harm from his offense conduct.  We disagree because there is no requirement under § 3A1.1(b) that a person suffer actual harm in order to be a vulnerable victim of another party's offense conduct.  Rather, a person can qualify as a victim if the defendant's offense conduct exposed that person to a risk of actual harm that was reasonably foreseeable, even though actual injury never occurred.

For example, in United States v. Bradley, this Court explained that the government does not have to present evidence of bodily injury or physical harm to patients for those patients to be vulnerable victims, stating:

> The second group [of victims] consists of patients whose prescriptions were filled using recycled blood-derivatives.  As for this group, Bradley III does not dispute that they are vulnerable, but

---

[5]As this Court explained in Birge, a prior version of the commentary to § 3A1.1 provided that the vulnerable victim increase applied "where an unusually vulnerable victim is made a target of criminal activity by the defendant."  830 F.3d at 1231-32 (quoting U.S.S.G. § 3A1.1 cmt. n.1 (1994)).  The Sentencing Commission removed this language in 1995.  Id. at 1232.

instead argues that they are not victims. Relying on application note 3 to § 2B1.1, Bradley III contends that a person must suffer "bodily injury" to qualify as a victim. He also insists that the Government could not rely on a hypothetical class of victims, but rather had to present evidence of actual physical harm done to the patients.

   Bradley III's reliance on the aforementioned application note is misplaced. The "vulnerable victims" enhancement is found in § 3A1.1, and the commentary to that section does not require a person to endure "bodily injury" to qualify as a victim. Instead, the examples provided in application note 2 tend to the opposite conclusion—there is no certainty that a cancer patient would experience bodily injury because of an ineffective cure, or that a disabled robbery victim would encounter violence during a theft, but both are nonetheless "vulnerable victims" under § 3A1.1(b) because their vulnerability is essential to the defendant's choice to victimize them.

644 F.3d 1213, 1288 (11th Cir. 2011) (footnote and citations omitted).

   Similarly, in United States v. Moran, this Court held that neither bodily injury nor financial loss is required for patients to qualify as vulnerable victims, explaining:

A "vulnerable victim" is a person "who is a victim of the offense of conviction," and "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." The increase applies when a defendant selected his victim to take advantage of that victim's perceived susceptibility to the offense. Neither bodily injury nor financial loss is required for an individual to qualify as a victim.

   Defendants Antonio Macli and Jorge Macli's argument that Medicare was the only victim of this fraud scheme fails. Although Medicare was the primary victim, elderly patients and substance-abuse patients at Biscayne Milieu also were victims of the offense. Elderly patients with dementia were transported daily from their assisted living facilities to Biscayne Milieu, which was not equipped

16

to address their care during the day.  Biscayne Milieu never treated other patients' substance-abuse issues in a meaningful manner.

778 F.3d 943, 978 (11th Cir. 2005) (citations omitted).

Importantly too, in this case there was a significant nexus between Martinez's offense conduct and the Patient's vulnerability.  Martinez admits the Patient was his sole assigned patient in the SICU from 8:00 a.m. until the transfer at 5:00 p.m., that the Patient's vital signs were fluctuating abnormally, that he did not inform anyone of the Patient's deteriorating vital signs, and that, had the SICU doctors been aware of the Patient's degrading health, they would not have allowed the transfer.  Approximately two hours later, at 7:25 p.m., Martinez falsified the Patient's records to cover up his gross medical negligence.

This first falsification at 7:25 p.m. (the offense conduct charged in Count 1) at least potentially adversely affected the Patient because the falsified medical records showed the Patient's vital signs were stable, even though they were not, and the Patient was still in the hospital when Martinez falsified the records.  Whether any person accessed the false records after 7:25 p.m. is irrelevant.  A hospital surgery patient subject to false medical records of the vital signs in the patient's hospital chart is at least potentially negatively impacted by the false records.  Indeed, Martinez admitted that "had anyone viewed Patient A's records, they would have seen an inaccurate patient history which might have resulted in a negative impact to Patient A's care."  Even though the government did not show

17

that Martinez's actions in covering up his gross medical negligence actually had such a negative impact on the Patient's care, Martinez's offense conduct (as soon as it was committed) nevertheless potentially adversely affected the Patient. Cf. United States v. Shenberg, 89 F.3d 1461, 1475 (11th Cir. 1996) (concluding that the district court properly applied the vulnerable-victim enhancement despite the fact that the victim in the case was a fictitious one). Under the particular facts of this case, we conclude that the Patient was a victim too of the offense conduct.

Alternatively, Martinez's gross negligence in not monitoring the Patient gave rise to Martinez's need to falsify the records a mere two hours later and is at least relevant conduct that is inextricably intertwined with the offense conduct. We recognize that Martinez argues that his grossly negligent care cannot be "relevant conduct" because it ceased approximately two hours before he began falsifying entries in the Patient's medical record, and therefore did not occur "during the course" of his offenses of conviction. See U.S.S.G. § 1B1.3(a)(1)(A) (defining relevant conduct, in part, as "all acts and omissions committed . . . or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"). This argument ignores that Martinez's negligent medical care caused the need to falsify the medical records in the first place and was inextricably intertwined with the commission of the offense.

18

Given the close two-hour timing here and the direct causal relationship between the negligent medical care and the false medical records, we reject Martinez's request to construe the phrase "during the commission of the offense of conviction" in § 1B1.3 so narrowly.

In any event, Martinez never raised this relevant conduct timing argument before the district court, nor in his initial brief on appeal in this Court. Rather, Martinez raises it for the first time in his reply brief before this Court. Accordingly, we decline to consider this argument.[6] See United States v. Smith, 416 F.3d 1350, 1354 (11th Cir. 2006) (per curiam) (explaining that where a party fails to timely present an issue in his initial brief on appeal, that issue is deemed abandoned and this Court will not consider it).

For these reasons, the district court did not err in applying the two-level vulnerable victim increase under § 3A1.1(b)(1).

## C.    The Acceptance-of-Responsibility Reduction

Although the district court did not err in applying the above increases to Martinez's offense level, there is one problem that requires that we vacate and remand.

---

[6]Notably, even if Martinez had preserved this argument in his initial brief, we would review it only for plain error because Martinez never objected on this timing basis in the district court. See Moran, 778 F.3d at 977. At a minimum, any alleged error is debatable, not plain.

19

The Sentencing Guidelines provide for a reduction of up to three points in a defendant's offense level if that defendant accepts responsibility for his actions.[7] U.S.S.G. § 3E1.1(a), (b).  Although the commentary to § 3E1.1 lists a number of non-exhaustive factors that a district court may consider in weighing whether to grant a reduction, the commentary does not include any conduct that would automatically preclude a defendant from receiving the reduction.  Id. § 3E1.1, cmts. n.1 & n.2.

Although a guilty plea in combination with an admission of the offense conduct will typically constitute significant evidence of acceptance of responsibility, "this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  Id. § 3E1.1, cmt. n.3. Defendants who plead guilty are not entitled to a § 3E1.1 reduction as a matter of right, and the district court's determination on whether to grant the reduction is entitled to "great deference."  Id. § 3E1.1, cmts. n.3 & n.5.

The sentencing court may consider a broad variety of evidence when considering whether to grant an acceptance-of-responsibility reduction, including whether the defendant has voluntarily withdrawn from criminal conduct.  United States v. Scroggins, 880 F.2d 1204, 1215 (11th Cir. 1989).  A district court does

---

[7]In reviewing a district court's refusal to grant a reduction under § 3E1.1, this Court reviews its interpretation of the Guidelines de novo.  United States v. Coe, 79 F.3d 126, 127 (11th Cir. 1996).  This Court reviews for clear error the factual findings upon which that denial is premised.  See United States v. Moriarty, 429 F.3d 1012, 1022–23 (11th Cir. 2005).

20

not err in denying the reduction if it concludes that a defendant's drug use after his arrest shows that he has not accepted responsibility and turned away from the lifestyle that motivated his offense. Id. at 1215–16; see also United States v. Pace, 17 F.3d 341, 343–44 (11th Cir. 1994) (concluding that the district court had discretion to consider defendant's subsequent marijuana use in declining to grant a § 3E1.1 reduction).

However, although a district court has broad discretion to grant or deny a reduction under § 3E1.1, a court errs if it believes that it does not have the authority to grant such a downward reduction. See United States v. Wilson, 183 F.3d 1291, 1301 (11th Cir. 1999). For example, in Wilson, the district court did not grant the defendant's requested two-level reduction for acceptance of responsibility and stated at sentencing that: "I don't know of any law that would allow me to be more lenient on you than I am." 183 F.3d at 1301. This was a misstatement of the law because § 3E1.1 grants the district court authority to give such a reduction. Id. Therefore, this Court concluded that "the [district] court erroneously determined that it did not have the authority to make this downward adjustment, and we must remand [the defendant's] case for the limited purpose of allowing the district court to determine, at a new sentencing hearing, whether he is eligible for such an adjustment." Id.

21

Here, the record indicates that the district court erroneously believed that a failed drug test meant that, as a matter of law, Martinez "loses his acceptance of responsibility," and it did not have the authority to grant the requested adjustment. For example, the district court stated that: "[I]t seems to me that under the rules if he tested positive, that's a violation of the law and he loses his acceptance of responsibility." The probation officer confirmed this belief, stating: "That is correct . . . he would not receive acceptance of responsibility based upon his positive urinalysis." The record is not ambiguous, but clear that the district court believed that if Martinez failed even 1 of the 18 drug tests, the district court lost authority to grant him the acceptance of responsibility adjustment. This was error. See Wilson, 183 F.3d at 1301.

Although we normally review errors in guidelines calculations for harmlessness, we cannot say, from the particular record in this case, that the error here was harmless. Puckett v. United States, 556 U.S. 129, 141, 129 S. Ct. 1423, 1432 (2009); see also Bradley, 644 F.3d at 1299–1300. If the district court had applied the three-level reduction for acceptance of responsibility, Martinez's advisory guidelines range would have been 24 to 30 months' imprisonment, not the 33-to-41-month range that the district court used. The district court, at the sentencing hearing, did not state that he would have imposed the same 60-month sentence absent any error in the guidelines calculations. See United States v.

Dean, 517 F.3d 1224, 1232 (11th Cir. 2008) (applying harmless error to affirm a sentence where the district court plainly stated that "he still would have imposed a term of 78 months imprisonment as a reasonable sentence, regardless of any guidelines miscalculation").

Accordingly, we must vacate the sentence and remand for the limited purpose of allowing the district court to determine whether a reduction for acceptance of responsibility is warranted or not under the factual circumstances here. See id. Because we remand to the district court to impose a new sentence, we decline to reach the issue of substantive reasonableness.

## IV.  CONCLUSION

For the foregoing reasons, we affirm the district court's increase to Martinez's offense level for (1) alteration and falsification of an "especially probative record" under U.S.S.G. § 2J1.2(b)(3)(B), and (2) knowing that the victim of the offense was vulnerable under § 3A1.1(b)(1).  However, because the district court erred in concluding that it lacked authority to grant Martinez an acceptance-of-responsibility reduction under § 3E1.1, we vacate Martinez's 60-month sentence and remand for the district court to decide only the acceptance-of-responsibility issue and resentence Martinez.

**VACATED AND REMANDED.**