**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————————

No. 24-11822

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

MALACHI MULLINGS,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cr-00060-MLB-RGV-1

————————————————

Before BRANCH, LUCK, Circuit Judges, and SCHLESINGER,* District
Judge.

———————

* Honorable Harvey E. Schlesinger, United States District Judge for the Middle
District of Florida, sitting by designation.

BRANCH, Circuit Judge:

Malachi Mullings pleaded guilty to criminal charges related to his involvement in laundering millions of dollars for an African fraud scheme. About a month later, while awaiting his sentence, Mullings's bond was revoked after he punched his girlfriend in the face. After spending time in custody, Mullings tried to withdraw his guilty plea, but the district court denied that request. Now, Mullings appeals that denial, arguing that his attorney bullied him into pleading guilty. Mullings also appeals several aspects of his sentence as procedurally unreasonable: (1) the district court's calculation of the loss amount; (2) the district court's application of a two-level aggravating-role enhancement to his offense level for recruiting a co-conspirator into the scheme and supervising him; (3) the district court's application of a four-level offense level enhancement for being in the business of money laundering; (4) the district court's application of a two-level offense level enhancement for obstructing justice; and (5) the district court's failure to apply a two-level offense level reduction for acceptance of responsibility. Finally, Mullings appeals his sentence of 120 months' imprisonment as substantively unreasonable. After careful review, we affirm.

## I.    Background

Malachi Mullings was charged with one count of conspiracy to commit money laundering and seven counts of money laundering. He retained Bruce Maloy to represent him.

According to the undisputed facts, Mullings opened 20 bank accounts between 2018 and 2021 for The Mullings Group, LLC, a company he registered in Georgia. Mullings claimed that The Mullings Group itself began as a legitimate trucking business, although a witness who reviewed the bank accounts testified at Mullings's sentencing hearing that she saw no "activity consistent with legitimate business activity." Beginning in 2018, Mullings used the accounts to launder the fraudulent proceeds of romance scams and business e-mail compromises.[1] Mullings also helped his co-conspirator, C.J., register a purported trucking company and open multiple bank accounts to launder money for similar romance scams and healthcare fraud schemes. Once Mullings and C.J. "cleaned" the fraud proceeds, they converted the proceeds to Bitcoin and sent them to Africa, where the perpetrators of the fraud were located.

After he was arrested, Mullings participated in proffer sessions with federal agents in an attempt to cooperate with the

---

[1] The "[r]omance scams were online fraud schemes" where "[s]cammers used fake online dating profiles to express strong romantic interest in the targeted users, frequently vulnerable individuals such as retired widows or widowers who possess significant financial assets, in order to trick them into sending money to the scammers or their co-conspirators under false pretenses." (quotation marks omitted). And the business e-mail compromises "were sophisticated scams targeting businesses and other entities that regularly performed wire transfers or other money transfers. In such schemes, perpetrators of the fraud, using spoofed email accounts, posed as customers or other legitimate business partners and sent emails to the victim designed to divert payments to a new bank account."

government, but no plea agreement was reached. Notwithstanding the lack of an agreement, on November 17, 2022, Mullings appeared before the district court for a change of plea hearing. During that hearing, Mullings at one point said that he "ha[d] a concern" and "need[ed] a moment." The district court invited Mullings to take his time, told him that he and Maloy could step outside, and stated that there was "no reason . . . that this has to be done today." The court stated that it was not trying to hurry Mullings into a decision and that it would reschedule the hearing "when [Mullings was] ready, if he's ready." Mullings did not enter a plea at the hearing that day.

After that failed change of plea hearing, Mullings retained Meagan Temple to represent him in addition to Maloy. On January 17, 2023, the district court held a second change of plea hearing, which both Maloy and Temple attended with Mullings. Before placing Mullings under oath, the court told him that he could be prosecuted if he said anything untruthful. During the plea colloquy, the court asked Mullings if he understood that no one could make him plead guilty, which Mullings confirmed that he did. The court also explained that Mullings would be giving up a number of rights by pleading guilty, including the right to a trial. Mullings confirmed that he understood that he was giving up certain trial-related rights and wanted to plead guilty anyway. Mullings testified that he had reviewed the entire indictment with his attorneys. The government then explained each count in the indictment, and the district court periodically paused the government's explanation of the charges to confirm that Mullings

understood what was being explained.  Mullings affirmed that he understood the elements of each count and that the charges were "consistent with [his] understanding . . . from [his] discussions with [his] lawyers."

Later in that second hearing, Mullings said that he did not know until after making certain deposits that those deposited funds were fraud proceeds.  Because knowledge is a required element of money laundering, the district court stopped the hearing and gave Mullings a break to confer with his attorneys.  After the break, Mullings thanked the district court for "giving [him] the time to gather [his] thoughts and to thoroughly understand."  Mullings then admitted knowing at the time he deposited the money that it was the proceeds of illegal activity and affirmed that he had made the deposits as part of a conspiracy to launder money.

The government then described the maximum penalties for each offense, and the district court confirmed that Mullings understood his possible sentence.  The district court explained how his sentence would be decided, and Mullings testified that his lawyers had explained the sentencing guidelines to him and how they might apply to his case.  He also testified that no one had made any promises or assurances of any kind to get him to plead guilty, that he was satisfied with his lawyers' performance, that he had had enough time to discuss the guilty plea with them, and that there was nothing he needed to talk about with them before he entered his plea.  Mullings pleaded guilty to all eight counts in the

indictment and testified that he was doing so freely and voluntarily and because he was, in fact, guilty.

While awaiting sentencing, state prosecutors obtained an arrest warrant for Mullings after he punched his girlfriend in the face during an argument. As a result, the district court revoked Mullings's bond. While in federal custody, Mullings moved, *pro se*, to withdraw his guilty plea, arguing that Maloy, his attorney, was overly focused on the sentencing phase of his case and had pressured Mullings to plead guilty. Mullings argued that those strategic disagreements, as evidenced by his initial hesitation to plead guilty, deprived him of the close assistance of counsel. Mullings also argued that the government did not abide by its disclosure obligations because it failed to tell Mullings before his change of plea that C.J. cooperated with the government.

Maloy and Temple withdrew as Mullings's attorneys, and the court appointed him a new attorney. The court then held a hearing on Mullings's motion to withdraw his guilty plea. At that hearing, Mullings testified that Maloy pressured him into pleading guilty and that Maloy met with him only four or five times for less than 40 minutes each meeting prior to the January change of plea hearing. Mullings also claimed that he lied during his plea colloquy when he said that he was satisfied with the services of his lawyers. He further testified that during the break at the January change of plea hearing, his lawyers took him into the hallway and "coerced and bullied" him into changing his testimony about whether he knew that certain deposits were proceeds from illegal activity.

Mullings said that during that conversation in the hallway Maloy yelled and that his face turned red.

Maloy, on the other hand, testified that Mullings did not tell him that he wanted to go to trial, that they discussed potential defenses and why going to trial would almost certainly end in a guilty verdict, and they reviewed some discovery together. Maloy also testified that he communicated with Mullings by phone, e-mail, and in person during meetings at his office and the courthouse. Maloy estimated that he spoke with Mullings over the phone "[h]undreds, maybe thousands," of times. Maloy further testified that during the hallway conversation during the change of plea hearing, he warned Mullings that the district court was forming a negative opinion of him, but he did not yell, bully Mullings, or force him to plead guilty. Maloy then said that he believed Mullings was telling the truth when he admitted guilt at his change of plea hearing.

Like Maloy, Temple testified that she and Mullings never discussed going to trial and that they had reviewed "everything with a fine-tooth comb." She also testified that while the hallway conversation was intense, she, Mullings, and Maloy each spoke an equal amount during that conversation, and Maloy did not threaten, coerce, or bully Mullings into pleading guilty. She also said that Maloy did not yell or turn red in the face.

The district court found Maloy and Temple to be credible witnesses and did not find Mullings's account of the hallway

conversation credible.  The district court denied Mullings's motion to withdraw his guilty plea.

Prior to sentencing, Mullings wrote a letter to the district court apologizing for his actions, discussing hardships in his life, and explaining that he "never intended to harm anyone" and that he "simply provided [his] business accounts for [the fraudster's] transactions."

To prove the loss amount attributable to Mullings and his aggravating role in the scheme, the government presented testimonial and documentary evidence at the sentencing hearing. Linda Downing, a corporate fraud auditor who worked at the U.S. Attorney's Office, testified about her analysis of the bank accounts belonging to the Mullings Group and C.J.'s company.  Downing, who had 15 years of experience as a fraud auditor, testified that she was looking for legitimate sources of income in the bank statements, but did not see anything in the Mullings Group accounts that looked related to a trucking business (or to a business more generally), such as repetitive and consistent transactions for rent or salaries.  Downing reviewed deposits into 19 accounts associated with the Mullings Group "line by line" to determine what funds were likely fraud proceeds.  Based on her experience, money spent on luxury items and the rapid transfer of funds soon after they were deposited to other individuals involved in the fraud were signs that the funds were fraudulently obtained.  Downing testified that she did her best to avoid "double counting" money being moved between Mullings's and C.J.'s accounts and to give

Mullings "the benefit of the doubt." For example, she did not include funds that came from C.J.'s accounts, funds transferred between Mullings's various accounts, or anything involved in "circular movement," such as funds transferred from a Mullings Group account to another person, then back to a Mullings Group account. She also did not include deposits that were outside the indictment's timeframe. During her testimony, Downing relied on her earlier analysis and at times could not answer questions about how she categorized specific transactions because she could not recall the details without referencing her "backup" notes which she did not have with her.

Downing concluded that $3.286 million in deposits to various Mullings Group accounts had indicia of fraud or money laundering. Downing reviewed C.J.'s accounts using the same methods and found that an additional approximately $1.2 million in deposits had indicia of fraud or money laundering.

Justin Christman, a federal agent who investigated Mullings and C.J., also testified at the sentencing hearing. He testified that he interviewed C.J. on multiple occasions where C.J. described his and Mullings's respective roles in the scheme. The government introduced, through Christman, text messages between phone numbers belonging to C.J. and Mullings. In those text messages, Mullings directed C.J. to open bank accounts, make deposits and withdrawals, and deposit money in specific accounts. Those exchanges also showed C.J. giving Mullings updates on his work. Christman testified that he believed the African fraud ring

committed the underlying fraud and directed Mullings on how to launder the money but Mullings himself did not have direct contact with the fraud victims.

The district court determined that Mullings's guidelines range was 188 to 235 months' imprisonment. In calculating the guidelines range, the district court found that the relevant loss amount was greater than $3.5 million, Mullings had an aggravating role in the scheme, he was in the business of money laundering, he obstructed justice, and he was not entitled to credit for accepting responsibility.

Before imposing its sentence, the district court emphasized the severity of Mullings's actions based on the amount of money involved, how a victim had her life destroyed "by sheer greed," and the fact that Mullings spent large amounts of money on luxury goods. The court also said that "there ought to be great deterrence" and that there was a need to protect the public from future crimes Mullings may commit. While the district court acknowledged that there were some mitigating circumstances in Mullings's background, it did not "see a lot." The court discussed the underlying fraud scheme but said that it would "not . . . overreact" because it "underst[oo]d what [Mullings's] role was." After considering the sentences that Mullings's co-conspirators received and their relevant conduct, the district court ultimately sentenced Mullings to 120 months' imprisonment.

## II.    Standard of Review

We review a district court's denial of a defendant's motion to withdraw his guilty plea for abuse of discretion and reverse only if the denial was "arbitrary or unreasonable." *United States v. Buckles*, 843 F.2d 469, 471 (11th Cir. 1988).

"When reviewing [sentencing] guidelines issues, we review legal questions de novo, factual findings for clear error, and the district court's application of the guidelines to the facts with due deference, which is 'tantamount to clear error review.'" *United States v. Isaac*, 987 F.3d 980, 990 (11th Cir. 2021) (quoting *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010)).    "To be procedurally reasonable, a defendant's guidelines range, including the application of any enhancements, must have been correctly calculated." *Id.*

We review the substantive reasonableness of a sentence under a "deferential abuse-of-discretion standard," and "take into account the totality of the circumstances." *Gall v. United States*, 552 U.S. 38, 41, 51 (2007).

## III.    Discussion

Mullings argues the district court abused its discretion by denying his motion to withdraw his guilty plea.  Mullings also argues that his sentence is procedurally unreasonable because the district court erred in calculating the loss amount, applying various enhancements to his guidelines offense level, and denying him an offense level reduction for acceptance of responsibility.  Finally, Mullings argues that his sentence is substantively unreasonable.

We first address Mullings's motion to withdraw his guilty plea, then we turn to the procedural and substantive challenges to his sentence.

### A.    Motion to withdraw the guilty plea

Mullings argues that the district court abused its discretion in denying his motion to withdraw his plea, which he claims he did not enter knowingly because he was in a state of haste and confusion and was not aware that C.J. was cooperating with the government.  He also argues that his plea was not entered voluntarily because his attorney, Maloy, pressured him into pleading guilty.

Defendants may withdraw a guilty plea after the court accepts the plea but before sentencing if they show "a fair and just reason for requesting the withdrawal."  Fed. R. Crim. P. 11(d)(2)(B).  In determining whether a defendant has shown a "fair and just reason" for withdrawing his plea, we "consider the totality of the circumstances surrounding the plea."  *Buckles*, 843 F.2d at 471–72.  The factors we consider include "(1) whether close assistance of counsel was available; (2) whether the plea was knowing and voluntary; (3) whether judicial resources would be conserved; and (4) whether the government would be prejudiced if the defendant were allowed to withdraw his plea."  *Id.* at 472 (citation omitted).  If a defendant received close and adequate assistance of counsel and entered his plea knowingly and voluntarily, we need not give considerable weight or attention to the conservation of judicial resources or prejudice to the

government. *United States v. Gonzales-Mercado*, 808 F.2d 796, 801 (11th Cir. 1987).

As to the first *Buckles* factor, Mullings had the close assistance of counsel. In assessing whether a defendant had the benefit of close assistance of counsel, we examine whether the defendant was "ably and professionally represented" and whether "the close assistance of counsel was available and utilized." *United States v. McCarty*, 99 F.3d 383, 385 (11th Cir. 1996). Mullings was represented by two attorneys—Maloy and Temple—when he pleaded guilty. The record shows that they both were available and utilized. The district court credited Maloy's testimony that he spoke on the phone with Mullings "hundreds, maybe thousands" of times. Maloy, whom the court found altogether credible, further testified that he met with Mullings multiple times at his office and at the courthouse, and regularly communicated with him via e-mail. Those conversations included reviewing discovery, discussing the viability of possible defenses and whether to file pre-trial motions, and explaining the plea process to Mullings. Temple, whose testimony the court also found credible, testified that they "spent a lot of time together going over everything with a fine-tooth comb." Mullings further utilized both his attorneys during his change of plea hearing when the district court granted Mullings a break to consult with them. Mullings then thanked the court "for giving [him] the time to gather [his] thoughts and to thoroughly understand" the guilty plea. In addition to these facts, the court also relied on Mullings's own testimony at the plea hearing that he was happy with his attorneys' assistance and had enough time to

speak with them before entering his plea. The court found Mullings's testimony at the plea hearing more credible than his "self-serving, after-the-fact testimony" from the hearing on the motion to withdraw his plea. Given these facts and the deference afforded to the district court's credibility determinations when deciding motions to withdraw a guilty plea, *see Buckles*, 843 F.2d at 472, the district court did not abuse its discretion in finding that Mullings had the close assistance of counsel because he was ably and professionally represented and his counsel was available and utilized, *see McCarty*, 99 F.3d at 385.

Now we address the second *Buckles* factor, whether Mullings's guilty plea was knowing and voluntary. Mullings argues that his plea was not entered knowingly because "he was in a state of haste and confusion at the time," and because the government did not disclose that C.J. was cooperating with the government. Neither argument is persuasive. Far from rushing him, the district court afforded Mullings substantial time to consider whether to plead guilty. When Mullings appeared unready to plead guilty at his first change of plea hearing on November 17, 2022, the district court unhesitatingly postponed the hearing. The court said that it would reschedule the hearing "when [Mullings was] ready, if he's ready" because there was "no reason" that the change of plea had to occur that day. Mullings had two months to consider whether to plead before the rescheduled hearing on January 17, 2023. The district court ensured that Mullings was not confused before pleading guilty. Mullings confirmed to the court that he understood his right to a trial and that he would give up that right

by pleading guilty. Mullings further testified that he had reviewed the indictment with his attorneys and repeatedly affirmed that he understood the elements of each charge based on conversations with his attorneys. When there was a question of whether Mullings had sufficient knowledge that the funds he laundered were the proceeds of illegal activity at the time he deposited them, the court gave Mullings a break to consult with his attorneys, and when they returned, Mullings indicated he wanted to move forward with the hearing and thanked the court "for giving [him] the time to gather [his] thoughts and to thoroughly understand." The district court did not abuse its discretion by finding that Mullings entered his guilty plea knowingly because Mullings repeatedly confirmed his understanding of the charges against him and the consequences of pleading guilty after hearing explanations from the district court and consulting with his attorneys. The district court's finding that Mullings pleaded guilty knowingly is further bolstered by the "strong presumption that [a defendant's] statements made during [a plea] colloquy are true." *See United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994).

Whether the government disclosed C.J.'s cooperation to Mullings does not alter our conclusion that the district court did not err in denying Mullings's motion to withdraw his guilty plea under Federal Rule of Criminal Procedure 11(d)(2)(B) because the government had no obligation to disclose such information. "The Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant," even though such evidence would likely

16                    Opinion of the Court                    24-11822

benefit the defendant in making his decision. *United States v. Ruiz*, 536 U.S. 622, 629, 633 (2002). And Mullings does not point to any non-constitutional disclosure obligation relevant to C.J.'s cooperation.

Mullings resists the district court's conclusion that he pleaded guilty voluntarily by arguing that his attorney, Maloy, "bullied and coerced" him into entering the plea. Mullings claims that Maloy pressured him into pleading guilty during a hallway conversation at a break in the change of plea hearing, and he pleaded guilty because he was "scared" after Maloy yelled at him and told him not to waste the district court's time. Not only does that story contradict Mullings's previous sworn testimony that no one had forced or threatened him to plead guilty, it also contradicts Maloy and Temple's sworn version of events. Maloy testified that he was not yelling, forceful, or irritated during that conversation— he merely explained to Mullings the consequences of not pleading guilty and why he should acknowledge his conduct. Temple's testimony corroborated Maloy's account of the conversation, confirming that Maloy never told Mullings to say anything untruthful and Maloy was not yelling or turning red. The district court credited Maloy and Temple's testimony and found that "there [was] zero evidence of coercion other than Defendant's uncredible testimony."[2] The district court did not abuse its discretion in so finding.

---

[2] While Maloy acknowledged that he informed Mullings that his statements during the plea colloquy could influence the district court to form a negative

24-11822                Opinion of the Court                17

The district court's conclusion that Mullings pleaded guilty knowingly and voluntarily is reinforced by the fact that Mullings did not move to withdraw his plea until over a month after it was entered. *See Buckles*, 843 F.2d at 473 ("The longer the delay between the entry of the plea and the motion to withdraw it, the more substantial the reasons must be as to why the defendant seeks withdrawal."); *Gonzales-Mercado*, 808 F.2d at 798, 801 (holding that a 27-day gap between guilty plea and motion to withdraw did not show a "swift change of heart" that would favor defendant). And Mullings moved to withdraw his plea after he punched his girlfriend in the face and had his bond revoked, which "suggests that [he] withdrew his plea in anticipation of a harsher sanction." *See Gonzales-Mercado*, 808 F.2d at 801. Thus, the district court did not abuse its discretion in finding that Mullings pleaded guilty knowingly and voluntarily.

Because Mullings received the close assistance of counsel and entered his plea knowingly and voluntarily, we need not give considerable weight or attention to the remaining *Buckles* factors—conservation of judicial resources or prejudice to the government. *Id.* Accordingly, the district court did not abuse its discretion in denying Mullings's motion to withdraw his guilty plea.

---

opinion of him, such a warning does not rise to the level of coercion. *See Buckles*, 843 F.2d at 472 (holding that attorney using professional judgment to recommend that defendant plead guilty did not constitute coercion). We also note that Maloy and Temple were retained counsel, and despite their disagreements, Mullings did not retain different counsel until after he moved to withdraw his guilty plea.

### B. *Procedural reasonableness of the sentence*

Mullings makes five arguments challenging the procedural reasonableness of his sentence. First, he challenges the district court's calculation of the loss amount. Second, he argues the district court erred by applying a two-level aggravating-role enhancement to his offense level. Third, Mullings claims the district court erred by applying a four-level offense level enhancement for being in the business of money laundering. Fourth, he argues the district court erred by applying a two-level offense level enhancement for obstructing justice. And finally, he argues the district court erred by denying his request for a two-level offense level reduction for acceptance of responsibility. We address each argument in turn.

### i. Loss amount calculation

The district court calculated the loss amount attributable to Mullings as greater than $3.5 million. Mullings argues that the district court erred in its calculation by relying on unreliable nonspecific evidence and by including money C.J. laundered in that calculation.

Under the sentencing guidelines, the base offense level for money laundering is eight, "plus the number of offense levels from the table in [U.S.S.G.] § 2B1.1 . . . corresponding to the value of the laundered funds." U.S.S.G. § 2S1.1(a)(2). Section 2B1.1 provides for an 18-level increase for a loss amount between $3.5 million and

$9.5 million.[3]  *Id*. § 2B1.1(b)(1)(J).  A defendant who engaged in a jointly undertaken criminal activity can be held responsible at sentencing for the actions of others if those actions were "within the scope of the jointly undertaken criminal activity," "in furtherance of that criminal activity," and "reasonably foreseeable in connection with that criminal activity."  *Id*. § 1B1.3(a)(1)(B). The government bears the burden of establishing the loss amount by a preponderance of the evidence.  *United States v. Bradley*, 644 F.3d 1213, 1290 (11th Cir. 2011).

Mullings first challenges the reliability of the loss amount evidence presented through the testimony of Downing, the U.S. Attorney's Office fraud auditor, at Mullings's sentencing hearing. Downing testified that she reviewed bank account records for the Mullings Group and for C.J.'s fake trucking company during the period alleged in the indictment.  Though she was looking for legitimate sources of income, Downing testified that she saw nothing in the Mullings Group accounts that looked like business-related expenses, such as payment for rent or salaries.  After reviewing 19 of "at least twenty" accounts associated with the Mullings Group, Downing aggregated the deposits made to each account from sources that appeared to be related to a fraud victim. To determine which deposits were fraud proceeds, Downing went through each account "line by line" for the period in the

---

[3] Mullings argues the appropriate loss amount is between $1.5 million and $3.5 million, which would warrant a 16-level increase to his offense level.  *See* U.S.S.G. § 2S1.1(b)(1)(I).

indictment, examining when money came in, when it was moved out, and where it went. Based on her experience, to identify signs of fraud proceeds, she looked for spending on luxury items, funds being moved from an account rapidly after they were deposited, and money being transferred to other accounts in what did not appear to be legitimate business expenditures.[4] Downing testified that she tried to avoid double counting funds and gave Mullings "the benefit of the doubt." For example, she did not count funds that came into Mullings's accounts from C.J.'s accounts, from Mullings himself, or that involved "circular movement," such as money leaving one of Mullings's accounts and later being returned to one of his accounts. Based on her analysis, Downing concluded that $3.286 million in deposits to various Mullings Group accounts were fraud proceeds. Downing conducted the same review of C.J.'s accounts and found that an additional approximately $1.2 million in deposits were fraud proceeds.

While Mullings argues that Downing's testimony and methodology were unreliable, the district court "[could not] say enough how credible [it] found her." Downing used a detailed methodology that incorporated her 15 years of experience as a fraud auditor and included reviewing every line in the relevant bank statements. Although there were a handful of transactions

---

[4] Even for the transactions where Downing could not identify a particular source of the money entering Mullings's accounts, she looked for other identifiers of laundering like substantial cash transactions, the use of platforms commonly associated with laundering, and rapid movement of funds.

where Downing could not identify the source of the funds while on the stand, district courts do not need to calculate loss amount "with utmost precision," and can make a "reasonable estimate of the loss amount." *Bradley*, 644 F.3d at 1290 (affirming the district court's adoption of the government's reasonable estimates of the loss amount). Downing's careful manual review is certainly one of the "variety of methods" that "court[s] may employ . . . to derive a 'reasonable estimate of the loss' to the victims." *See United States v. Stein*, 846 F.3d 1135, 1152 (11th Cir. 2017) (quoting *United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002)). Accordingly, the district court did not err by relying on Downing's analysis.

And the district court did not err in counting the fraud proceeds C.J. laundered in the loss amount attributable to Mullings because the government presented reliable evidence that C.J.'s money laundering was directed by Mullings, and it was foreseeable that their joint activity was in furtherance of illegal laundering. *See* U.S.S.G. § 1B1.3(a)(1)(B). The government introduced text messages between Mullings and C.J. through Justin Christman, a federal agent who investigated Mullings and C.J. Multiple text exchanges between C.J. and Mullings showed that Mullings told C.J. how to open bank accounts, Mullings provided C.J. with necessary documents to open those accounts, C.J. sent Mullings updates on his progress, and C.J. followed instructions when Mullings told him to go to a particular bank or where to deposit money. In another text exchange, Mullings gave C.J. directions for how to withdraw significant funds without raising any suspicion from the banks. While Mullings tries to discredit that evidence as

unreliable hearsay, sentencing courts may consider hearsay if the evidence has sufficient indicia of reliability, which exists here. *See United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir. 2010). Christman testified he had confirmed that the phone numbers on each end of the conversation belonged to C.J. and Mullings, that the text exchanges were consistent with what C.J. told the government, and that the messages were further corroborated by bank records related to the accounts Mullings helped C.J. open. Accordingly, the district court appropriately included the $1.2 million associated with C.J.'s accounts.

Thus, the district court did not clearly err in calculating the loss amount as between $3.5 million and $9.5 million and applying the resulting 18-level offense level increase under § 2B1.1(b)(1)(J).

### ii. Aggravating-role enhancement

Mullings contends that the district court erred in giving him a two-level enhancement in his offense level for having a managerial role in the scheme because C.J.'s statements that Mullings recruited and directed him were self-serving, unreliable hearsay. Mullings also argues that his role in the scheme was minor relative to the total scope of his co-conspirator's African fraud network.

A two-level offense level enhancement applies if the defendant was "an organizer, leader, manager, or supervisor in any criminal activity" but was not an organizer, leader, manager, or supervisor of an activity that had five or more participants or was otherwise extensive. U.S.S.G. § 3B1.1. Asserting control over one

individual is enough to support a two-level § 3B1.1(c) aggravating-role enhancement. *United States v. Grushko*, 50 F.4th 1, 16 (11th Cir. 2022). And "[t]he defendant does not have to be the sole leader of the conspiracy for the enhancement to apply." *United States v. Barrington*, 648 F.3d 1178, 1200 (11th Cir. 2011).

The same reliable evidence that demonstrated Mullings and C.J. worked together in furtherance of the fraud scheme shows that Mullings had a supervisory role over C.J. The text exchanges showed that Mullings told C.J. how to open bank accounts and that C.J. followed Mullings's instructions and sent Mullings status updates on his work. That evidence shows that Mullings asserted control and influence over C.J. by recruiting him into the scheme and instructing him in how to operate as a money launderer, which warranted a two-level aggravating-role enhancement. *See Grushko*, 50 F.4th at 16.

Though there may have been members of the conspiracy with a more significant supervisory role than Mullings, that fact does not negate that Mullings recruited and directed C.J. *See id.* (applying the two-level aggravating-role enhancement when the defendant recruited a co-conspirator notwithstanding another co-conspirator's relative role). Accordingly, the district court did not clearly err in applying a two-level aggravating-role enhancement.

### iii. Enhancement for being in the business of money laundering

Mullings argues that he should not have received a four-level enhancement to his offense level for being in the business of

money laundering because he only laundered money for a short period of time for one group of fraudsters and because the bank accounts he used to launder funds originally had a legitimate purpose.

The sentencing guidelines provide for a four-level enhancement to a defendant's offense level if "the defendant was in the business of laundering funds."   U.S.S.G. § 2S1.1(b)(2)(C). The application notes to the guidelines instruct courts to look at the totality of the circumstances to determine whether a defendant was in the business of laundering funds, and suggest considering whether (1) the defendant regularly laundered funds; (2) the defendant laundered funds during an extended period of time; (3) the defendant laundered funds from multiple sources; (4) the defendant generated a substantial amount of revenue in return for laundering funds; (5) the defendant had prior money laundering convictions under either federal or state law; or (6) during an undercover investigation, the defendant stated that he engaged in any of the conduct in the first four factors.[5]   *Id.*, cmt. (n.4(A), (B)(i)–(vi)).

---

[5] In *United States v. Dupree*, we held that that courts "may not defer" to the commentary to the Sentencing Guidelines "if uncertainty does not exist" in the guideline itself. 57 F.4th 1269, 1275 (11th Cir. 2023) (en banc) (quotation omitted).  However, here, both parties rely on the commentary and do not dispute its validity.   Thus, we need not decide whether the text of § 2S1.1(b)(2)(C) is ambiguous, and we will also rely upon the commentary in determining whether the district court properly applied the enhancement for being in the business of money laundering.  *See United States v. Jews*, 74 F.4th 1325, 1327 & n.2, 1328 (11th Cir. 2023) (relying on the commentary of a

24-11822            Opinion of the Court                    25

The totality of the circumstances shows that Mullings was in the business of money laundering. First, Mullings regularly laundered funds—he set up 20 bank accounts at multiple banks for a business that had no apparent legitimate business activity and laundered nearly $3.3 million through those accounts. Second, Mullings laundered funds for an extended period of time—over a year and a half. Third, despite Mullings's contention that he laundered money from only one source, the African fraud ring, they originated from romance scams, business e-mail compromises, and health care fraud perpetrated against more than 20 victims. And fourth, Mullings concedes that he generated substantial revenue from the 10% commission he received on the funds he laundered.[6] Accordingly, when considering the totality of the circumstances, the district court did not clearly err in applying a four-level enhancement to Mullings's offense level for being in the business of money laundering.

---

guideline where "[n]o party contest[ed] the commentary's validity . . . or the propriety of its interpretation of [the guideline's] text").

[6] While factors five and six do not apply to Mullings—he does not have prior money laundering convictions and did not make any statements that were collected as part of an undercover investigation—the majority of the factors for determining whether the totality of the circumstances shows that Mullings was in the business of money laundering are present. Thus, we are not "left with a definite and firm conviction that a mistake has been committed." *See Isaac*, 987 F.3d at 990 (quoting *Rothenberg*, 610 F.3d at 624).

### iv. Obstruction-of-justice enhancement

Additionally, Mullings argues that the district court improperly applied a two-level enhancement to his offense level for obstruction of justice under U.S.S.G. § 3C1.1 because his denial of guilt was not an intentional lie and was "less than a general denial of guilt." We disagree.

A defendant's offense level should be increased by two levels if

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

U.S.S.G. § 3C1.1. A defendant's denial of guilt cannot serve as the basis for an obstruction-of-justice enhancement unless the defendant makes "a denial of guilt under oath that constitutes perjury." *Id.*, cmt. (n.2). "Perjury, for purposes of applying [the obstruction-of-justice] enhancement" is "'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002) (quoting *United States v. Dunnigan,* 507 U.S. 87, 94 (1993)).

In *United States v. Freixas*, the defendant, Freixas, testified under oath at her plea colloquy that she was guilty of the relevant

counts, that she was pleading guilty voluntarily and not because of any external pressure, and that she was satisfied with her attorney's services. 332 F.3d 1314, 1317–18 (11th Cir. 2003). Freixas later moved to withdraw her guilty plea and argued that she was not guilty, her counsel failed to discuss the evidence with her, promised her a particular sentence, did not discuss potential defenses with her, and only met with her three times. *Id.* at 1318. This Court concluded that "one of these accounts necessarily was dishonest," and the district court was "well within its discretion in crediting the former and discrediting Freixas's later disavowal of the voluntariness and intelligence of her guilty plea." *Id.* at 1321. We thus held that a two-level obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 was appropriate. *Id.*

Just like in *Freixas*, Mullings's denial of guilt was made under oath and, having been found to be a willful falsehood, was sufficient to constitute perjury.[7] Mullings's initial admission of

---

[7] Mullings argues that an obstruction-of-justice enhancement is only applicable if the defendant's statements "went beyond a general denial of guilt." While *Freixas* quoted one unpublished out-of-circuit case where contradictory statements that went beyond a general denial of guilt were sufficient for an obstruction-of-justice enhancement, it did not impose a requirement that a defendant's statements must go beyond a general denial of guilt. *See* 332 F.3d at 1321 (quoting *United States v. Laano,* 58 F. App'x 859, 862 (2d Cir. 2003)). Even assuming that making statements beyond a general denial of guilt is a requirement for applying the enhancement, the district court did not err because Mullings's statements were more than a general denial of guilt. Mullings made contradictory assertions regarding his knowledge of the fraud scheme and the assistance his attorneys provided.

guilt and confirmation that his plea was knowing and voluntary occurred under oath during his plea colloquy. And similarly to Freixas, Mullings later disclaimed his statements from the plea colloquy about his guilt and the amount of assistance his attorneys provided. So Mullings "necessarily was dishonest" either during his plea colloquy or during his later attempt to withdraw his guilty plea. *See id.* The district court was "well within its discretion" to credit Mullings's statements during the plea colloquy and discredit his later contradictory statements. *See id.* And Mullings's contradictory statements satisfy the requirement set forth in § 3C1.1 that a defendant's obstructive conduct must relate "to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. Mullings's contradictory statements under oath directly related to his offense of conviction because they directly concerned his guilt. Thus, the district court did not clearly err by applying a two-level obstruction-of-justice enhancement to Mullings's offense level.

### v. Denial of reduction for acceptance of responsibility

Next, Mullings argues that the district court erred in declining to grant his request for a two-level reduction of his offense level under U.S.S.G. § 3E1.1(a) for accepting responsibility, pointing to the statements he made during his proffer sessions with the government and his initial guilty plea where he admitted his role in the fraud scheme. Mullings also argues that because his attempt to withdraw his plea formed the basis for enhancing his

offense level for obstruction of justice, it should not also be considered against him under this provision of the guidelines.

Section 3E1.1(a) of the sentencing guidelines provides for a two-level reduction in offense level if a defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). A defendant's guilty plea is significant evidence of an admission of responsibility, *see United States v. Wade*, 458 F.3d 1273, 1279 (11th Cir. 2006), but that "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility," *United States v. Mathews*, 874 F.3d 698, 709 (11th Cir. 2017) (citing U.S.S.G. § 3E1.1, cmt. (n.3)). The defendant bears the burden of proving that he has accepted responsibility. *Wade*, 458 F.3d at 1279.

Here, the district court properly considered that Mullings's statements made during the hearing for his motion to withdraw his guilty plea indicated a lack of acceptance of responsibility and determined that those statements outweighed any earlier acceptance of responsibility. For example, after his guilty plea, Mullings testified under oath that he was innocent of the charges against him and downplayed his role in the scheme and knowledge of the fraud by claiming he "simply provided [his] business accounts for [the fraudster's] transactions."[8] *See United States v.*

---

[8] Mullings also argues that denying him a reduction for acceptance of responsibility violates his due process rights by punishing him for exercising his constitutional right to a trial. Mullings's argument is foreclosed by binding precedent that determined "[s]ection 3E1.1 may well affect how criminal defendants choose to exercise their constitutional rights . . . . but no good

*Sammour*, 816 F.3d 1328, 1341 (11th Cir. 2016) (holding that defendant was not entitled to acceptance of responsibility reduction when he downplayed his culpability). Mullings's testimony and his attempt to minimize his conduct is "inconsistent with . . . [an] acceptance of responsibility." *See Mathews*, 874 F.3d at 709.

Further, Mullings is incorrect in arguing that conduct that led to an obstruction-of-justice enhancement cannot be used in determining whether he accepted responsibility. In fact, the sentencing guidelines recognize that, while there may be "extraordinary cases" in which an obstruction-of-justice enhancement and an acceptance-of-responsibility reduction both apply, "[c]onduct resulting in an enhancement under § 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." U.S.S.G. § 3E1.1, cmt. (n.4). Mullings has not articulated any way in which his case is extraordinary. Thus, the district court did not clearly err in denying Mullings a reduction for acceptance of responsibility based on conduct that led to an obstruction-of-justice enhancement.

## C. *Substantive reasonableness of the sentence*

Mullings's final argument is that his sentence was substantively unreasonable because the district court failed to

---

reason exists to believe that 3E1.1 was intended to punish anyone for exercising rights." *United States v. Henry*, 883 F.2d 1010, 1011 (11th Cir. 1989) (holding that the acceptance-of-responsibility provision of the sentencing guidelines does not violate the Due Process Clause).

adequately consider the circumstances of his offense. He claims the district court ignored his personal history and conflated his role as a money launderer with those who directly perpetrated the underlying fraud that generated proceeds. He also argues that his sentence is unreasonable given the disparities between his sentence and the sentences imposed on his co-conspirators.

A district court abuses its discretion in imposing a sentence when it (1) fails to consider relevant factors that were due significant weight; (2) gives an improper or irrelevant factor significant weight; or (3) commits a clear error of judgment by balancing the proper factors unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc). We vacate a sentence as substantively unreasonable only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence outside the range of reasonable sentences as dictated by the facts of the case." *Id.* at 1190 (quotations omitted). The party challenging the sentence bears the burden of showing that the sentence is unreasonable. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). We grant substantial deference to the sentencing court. *Id.*

The district court must consider several sentencing factors, including the nature of the offense; the defendant's characteristics and history; "the need for the sentence imposed to reflect the seriousness of the offense," to provide "adequate deterrence to criminal conduct," and "to protect the public from further crimes

of the defendant"; and the need to avoid unwarranted sentencing disparities between similarly situated defendants.    18 U.S.C. § 3553(a)(1), (a)(2)(A)–(C), (a)(6).

We begin by noting that Mullings's sentence of 120 months' imprisonment was significantly below his guidelines range of 188 to 235 months and the statutory maximum of 110 years, which indicates the sentence was reasonable. *See United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("Although we do not automatically presume a sentence within the guidelines range is reasonable, we ordinarily . . . expect a sentence within the Guidelines range to be reasonable." (omission in original) (quotations omitted)); *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that a sentence that is below the statutory maximum is an indicator of reasonableness).

Further, the district court adequately considered and weighed the § 3553(a) factors.  At the sentencing hearing, the district court stated that the sentence was meant to reflect the seriousness of the crime, to provide deterrence, to protect the public from further crimes Mullings may commit, and to "accomplish[] the other purposes [of § 3553(a)]."  That statement was more than sufficient to satisfy the requirement that the district court consider relevant factors. *See United States v. Turner*, 474 F.3d 1265, 1281 (11th Cir. 2007) (holding that the district court "need not state on the record that it has considered each of the § 3553(a) factors" and that an acknowledgment that it has considered the factors is sufficient).

Mullings points to mitigating circumstances related to his personal history that he claims the district court ignored, but the district court considered those facts in its decision when it acknowledged, "I don't see a lot about [Mullings's] background that's all that mitigating, although, there's some there." The district court, as it was entitled to do, simply weighed more heavily Mullings's contribution to "the destruction of [a victim's] life by sheer greed," his lavish spending with the illicit gain, and the severity of his domestic abuse and fraud. *See United States v. Butler*, 39 F.4th 1349, 1355 (11th Cir. 2022) ("[T]he weight given to each factor is committed to the sound discretion of the district court.").

And the district court did not conflate Mullings's role as a money launderer with the role of his co-conspirators who communicated directly with victims to perpetrate the underlying fraud. The court was clear that while it would take the impact on the fraud victims into account, it would not "overreact" because of "the other thieves in this case" and that its "only reaction . . . [wa]s going to be on [Mullings]." The district court weighed Mullings's relative culpability and determined that "it's just so greedy and awful . . . even if he's not the one talking to those poor [victims], that he can be in any way a part of it." So the court sentenced Mullings for his role as a money launderer and distinguished conduct committed by his co-conspirators that served other roles in the fraud schemes.

Finally, we turn to whether Mullings's sentence created unwarranted sentencing disparities. Mullings points to three

people involved in the same fraud scheme as relevant comparators, all of whom received more lenient sentences than Mullings. But sentencing courts must only consider "the need to avoid unwarranted sentence disparities *among defendants with similar records*." 18 U.S.C. § 3553(a)(6) (emphasis added). So the district court need not use any comparator that has a "significant distinction[]" in his circumstances, such as whether he "lacked [an] extensive criminal histor[y]." *United States v. Jayyousi*, 657 F.3d 1085, 1117–18 (11th Cir. 2011). Here, the district court did not err because the defendants that Mullings identifies were not similarly situated to him. Two of those defendants received U.S.S.G. § 5K1.1 reductions for providing substantial assistance to the government, and all three had lower criminal history categories than he has. Thus, the comparators that Mullings points to are not defendants with similar records and need not have been considered by the district court. *See United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008) (finding that defendants were not similarly situated when one provided substantial assistance to the government and the other did not, so their sentencing disparity was not unwarranted).

The district court properly considered the § 3553(a) factors, distinguished Mullings's role from others in the scheme, accounted for his personal history, did not create unwarranted sentencing disparities, and imposed a sentence well below the guidelines range. Thus, Mullings's sentence was not substantively unreasonable.

## IV.    Conclusion

The district court did not abuse its discretion in denying Mullings's motion to withdraw his guilty plea, nor did it err in applying the sentencing guidelines, and Mullings's sentence was substantively reasonable.

**AFFIRMED.**